**In re Complaint of JUDICIAL MISCONDUCT.**

**C.C.D. No. 13–01.**

U.S. Judicial Conference Committee on Judicial Conduct and Disability.

Jan. 17, 2014.

Present: Judges ANTHONY J. SCIRICA, Chair, SARAH EVANS BARKER, EDITH BROWN CLEMENT, DAVID M. EBEL, JAMES E. GRITZNER.[1]

## MEMORANDUM OF DECISION

This matter is before the Committee on petitions for review filed by complainant Third Circuit Chief Judge Theodore McKee on May 16, 2013 ("first petition") and July 23, 2013 ("second petition") regarding his March 6, 2012 complaint

---

**1.** This panel comprised five members of the seven-member Committee, the other two members having been excluded from participation in this matter under Rule 21(c) of the Judicial Conference Rules for Judicial–Conduct and Judicial–Disability Proceedings (2008).

against Judge Richard Cebull under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351–364 ("Act") and Rules for Judicial–Conduct and Judicial–Disability Proceedings, 248 F.R.D. 674 (U.S.Jud.Conf.2008) ("JCD Rules"). The petitions address three unpublished Ninth Circuit Judicial Council orders on both Judge McKee's complaint and another related complaint against Judge Cebull: an order of March 15, 2013; an order of May 13, 2013 purporting to vacate the March 15 order; and an order of July 2, 2013 issued in lieu of the March 15 order. The petitions argue that the March 15 order should be published as the resolution of these complaints. They also argue, in essence, that the subsequent orders are invalid as wrongly relying on a theory that Judge Cebull's retirement mooted the complaints and as inappropriately withholding factual findings that the March 15 order included. The Committee reviews these petitions under 28 U.S.C. § 357(a) and JCD Rules 21(a) and 21(b)(1)(A). For reasons we explain, the petitions are granted.

## I. Factual Background

The complaints arose from a February 2012 incident in which Judge Cebull, using his court email account, forwarded to six acquaintances an email message under the subject line, "A MOM'S MEMORY." The message was as follows:

> Normally I don't send or forward a lot of these, but even by my standards, it was a bit touching. Hope it touches your heart like it did mine. A little boy said to his mother, Mommy, how come I'm black and you're white? His mother replied, "Don't even go there Barack! From what I can remember about that party, you're lucky you don't bark!"

Judge Cebull's forwarding of the email in question was widely reported in the local and national press. The ensuing notoriety was extensive, with calls for action—including demands that Judge Cebull resign—from members of Congress, governmental and non-governmental organizations, and members of the public. In particular, the incident received attention from members of the House Judiciary Committee. On March 6, 2012, Representatives John Conyers and Steve Cohen sent a letter to House Judiciary Committee Chair Lamar Smith requesting that the Judiciary Committee "investigate the potential consequences of Judge Cebull's conduct independent of whatever it is that the Ninth Circuit concludes." Another member of the House Judiciary Committee, Representative Hank Johnson, wrote directly to Judge Cebull asking him to resign.

There was also a substantial response from the public, and the story was widely reported in the local and national press. The Montana Human Rights Network collected more than 2,800 signatures on a petition calling for Judge Cebull to resign. The Crow Tribal Legislature passed a resolution asking Montana's federal legislators to take steps to impeach and remove Judge Cebull. Six professors at the University of Montana Law School published an editorial on March 14, 2012, writing that litigants before Judge Cebull "now have clear reason to question his ability to be fair and impartial when they appear in his court."

## II. Procedural History

When this incident became public through media reports, Judge Cebull wrote a letter of apology to the President.[2]

---

**2.** The letter stated, in relevant part, as follows: "I sincerely and profusely apologize to

you and your family for the email I forwarded. I accept full responsibility; I have no one

He also asked Ninth Circuit Chief Judge Alex Kozinski to initiate a misconduct inquiry into the incident and waived "any confidentiality as to making this request or to the existence of any proceedings that may ensue from it." Judge Cebull's request was docketed as a complaint filed under the Act by Judge Cebull against himself. Chief Judge McKee filed his complaint against Judge Cebull based on the same incident, waiving "any right [of his own] to confidentiality in the proceedings." Ten additional complaints were filed regarding the incident, which the Ninth Circuit Judicial Council held in abeyance pending an investigation into Judge Cebull's and Judge McKee's complaints.[3] In accordance with JCD Rule 11(f), Chief Judge Kozinski referred Judge Cebull's self-initiated complaint and Judge McKee's complaint to a five judge special investigating committee, which took testimony and reviewed relevant email, documents, and statistics.

On March 15, 2013, the Ninth Circuit Judicial Council disposed of the two complaints in an order detailing the special committee's findings of judicial misconduct and issuing sanctions against Judge Cebull. A copy of this order was sent to Judge Cebull and to Chief Judge McKee under JCD Rule 20(f). The order found that Judge Cebull's conduct was " 'prejudicial to the effective administration of the business of the courts' under 28 U.S.C. § 351." It further found that Judge Cebull had violated Canon 2 of the Code of Conduct, which provides that a "judge should avoid impropriety and the appearance of impropriety," and Canon 5 of the Code of Conduct, which prohibits political activity. The order stated that Judge Cebull's conduct was "contrary to the Code of Conduct for United States Judges." It also noted that "[t]he strength and breadth of the public reaction to the publication of the February 2012 email illustrates the severity of the violation."

In the March 15 order, the Judicial Council issued a public reprimand, ordered that no new cases be assigned to Judge Cebull for 180 days, and ordered Judge Cebull to complete training on judicial ethics, racial awareness and elimination of bias "[t]o restore the public's confidence that any possible conscious or unconscious prejudice will not affect future decisions." The order described Judge Cebull's past email practices as discovered by the special committee, and "strongly condemn[ed]" them. It also condemned Judge Cebull's initial public apology as "insufficient to acknowledge fully or redress his past actions and the totality of his discriminatory emails" and required that he "issue a second public apology, approved by the Judicial Council," that would "acknowledge the breadth of his behavior and his inattention to ethical and practical concerns surrounding personal email." Two members of the Judicial Council, Chief District Judge Wilken and District Judge Ishii, wrote a concurring statement that "the Judicial Council should request that Judge Cebull voluntarily retire from the judiciary under 28 U.S.C. § 371(a) in recognition of the severity of

---

to blame but myself. I can assure you that such action on my part will never happen again."

**3.** Citing no authority for holding the additional complaints in abeyance, the Ninth Circuit Judicial Council's March 15 order described them as "based solely on public reports" and not offering "any firsthand information."

The Council has apparently not taken any action on the additional complaints. As the filer of a complaint addressed by the orders here in question, Chief Judge McKee was entitled to receive those orders, but because the other ten complaints were held in abeyance, those individuals were not sent copies of the orders.

his violation and the breadth of the public reaction."

The March 15 order noted that the special committee investigated Judge Cebull's cases—in particular, his dispositions of labor, employment, civil rights and prisoner rights matters—and his criminal sentencing, as well as his cases that were appealed. The investigation found no evidence of bias in his rulings or in his sentencing practices, and no cases that were "troubling." The order noted the special committee interviewed "key individuals in Montana's legal community, court staff and Judge Cebull's professional and social contacts," and found that "[w]itnesses generally regarded Judge Cebull as a good and honest trial lawyer, and an esteemed trial judge."

Under JCD Rule 20(f), the March 15 order was set to be published on May 17, absent any petition for review.[4] But there were further developments in the interim. On April 2, the Ninth Circuit Judicial Council announced through its public website that Judge Cebull had decided to retire effective May 3. On April 23, Chief Judge McKee wrote to the Judicial Conduct and Disability Committee, asking (1) whether the March 15 order must be published as it then stood, and (2) whether any modification of the order would begin a new appeal period. The Committee responded to Judge McKee, with a copy to the Ninth Circuit Judicial Council, that the March 15 order must, under JCD Rule 24(a), be published, and that any modification of the order would begin a new appeal

period. Then, on May 3, the Ninth Circuit Chief Judge posted on the court's public website the following announcement: "The Judicial Council now finds it necessary to review the procedural status and will consider the matter at its next regular meeting, scheduled for June 28, 2013." Ten days later, on May 13, the Ninth Circuit Judicial Council issued an order vacating its March 15 order as moot in light of Judge Cebull's retirement and stating that the Judicial Council would "consider appropriate revisions" at a forthcoming meeting, scheduled for June 28.

On May 16, Chief Judge McKee filed a petition for review ("first petition") asking the Judicial Conduct and Disability Committee to review the May 13 vacatur. The Ninth Circuit Judicial Council responded that the Committee had no jurisdiction to conduct review at that time because (1) the Judicial Council's vacatur order "is not a final order," and (2) the March 15 order "is not reviewable because it was vacated."[5] It characterized the "case" as "still pending before our Judicial Council." These arguments notwithstanding, the petition's pendency with this Committee required that both the March 15 order and the May 13 vacatur remain, at least for the time being, unpublished.

Against this backdrop, the Ninth Circuit Judicial Council took further action. On July 2, it issued an order that "dismissed the complaints as moot," declaring that the "intervening event" of Judge Cebull's retirement "concludes these proceedings," and that the vacatur of the March 15

---

**4.** Under JCD Rule 22(c), any such petition must be filed "within 63 days of the date of the order for which review is sought."

**5.** Although we doubt that a Judicial Council action under the Act could thus evade review, we need not reach that issue. One of petitioner's arguments focuses on the prospect that the March 15 order would be withheld

from the public record in this matter-a prospect that, in our view, ripened only upon issuance of the July 2 order, which the Council evidently does deem "final." Petitioner's other argument implicates the May 13 vacatur but is more directly a challenge to the July 2 order's characterization of this matter as moot and as concluded for intervening events.

order had been predicated on "changed circumstances" resulting from Judge Cebull's retirement. While still describing Judge Cebull's actions in this matter as "misconduct," the July 2 order presented a truncated version of the March 15 order's findings.

The March 15 Judicial Council order had described hundreds of inappropriate email messages that were received and forwarded from Judge Cebull's court email account. The emails were identified by category, noting emails that were "political in nature" and emails that "showed disdain and disrespect for liberal political leaders"; race-related emails that "showed disdain and disrespect for African Americans and Hispanics, especially those who are not in the United States legally"; "emails related to religion [that] showed disdain for certain faiths"; "emails concern[ing] women and/or sexual topics and were disparaging of women"; "emails contain[ing] inappropriate jokes relating to sexual orientation"; and "emails related to pending legislation or an issue that could come before the court, such as immigration, gun control, civil rights, health care or environmental matters."

None of the foregoing descriptions appears in the order of July 2, 2013. That order recharacterized its predecessor's findings and omitted many salient details. For example, in lieu of the March 15 order's nearly two-page description of the number and nature of inappropriate emails, the order of July 2 noted only that "Judge Cebull sent a substantial number of similarly inappropriate emails from his court email account." The July 2 order included only a truncated version of the March 15 order's discussion of witness interviews and the public response to the February 2012 email. And it omitted the March 15 order's discussion of the specific conduct violations and the particularities of

the public reprimand and the sanctions ordered, replacing it with the remark that "[t]he Judicial Council found misconduct with regard to the emails Judge Cebull sent from his court account, and issued an Order and Memorandum ... imposing a number of remedial and disciplinary measures."

In summary, the July 2 order diverges from its predecessor in its (1) lack of specificity as to the number, nature, and targets of inappropriate emails found to have been sent by Judge Cebull; (2) recharacterization of the misconduct in a way that eliminates all references to "disdain and disrespect" for various groups; (3) lack of specificity as to why the emails constituted misconduct; (4) de-emphasis of derogatory findings by reduction of their extent and prominence relative to extenuating material; and (5) omission of any reference to the concurrence in which two Council members indicated that they would have sought Judge Cebull's resignation.

Chief Judge McKee filed a new petition for review ("second petition") on July 23, incorporating the first petition by reference and requesting review of the July 2 order. (Under JCD Rule 20(f), Chief Judge McKee was entitled to receive and did receive the July 2 order.) This petition expressed "concern about the propriety of a Judicial Council issuing a final order making detailed findings of extensive judicial misconduct and then, after the subject judge retires, sua sponte vacating its own final order and issuing a new order that effectively conceals the judicial misconduct that previously had been identified and detailed." The Ninth Circuit Judicial Council, in an August 9, 2013 letter of response to the Committee, explained that the July 2 order sought only to "disclose[ ] enough about the investigation to ensure the public knows that the matter was taken seriously ..." because, in the Council's

view, "[saying anything further would be punitive, which is no longer appropriate...." Thus, the Judicial Council did not intend to publish its March 15 order, which it declared "vacated."

## III. Discussion

### A. Publication of the March 15 Order

The Judicial Conduct and Disability Act of 1980 mandates that "[e]ach written order to implement any action under section 354(a)(1)(C) ... *shall* be made available to the public through the appropriate clerk's office of the court of appeals for the circuit." 28 U.S.C. § 360(b) (emphasis added). (Section 354(a)(1)(C) governs action taken "if the complaint is not dismissed.") JCD Rule 24(a) requires that "all orders entered by the chief judge and judicial council" be made public "[w]hen final action has been taken on a complaint and it is no longer subject to review" of right. An order by a Judicial Council is no longer subject to review of right after "63 days of the date of the order" or, if a timely petition for review is filed, after the Committee adjudicates the petition. Neither 28 U.S.C. § 360(b) nor JCD Rule 24(a), by its terms, limits this publication requirement to "final" orders. The JCD Rules provide no exception to the requirement other than granting the Judicial Council discretion, in specified circumstances, to decide whether to identify the subject judge. JCD Rule 24(a)(2). As noted, the Act refers to publication of orders implementing any action under Section 354(a)(1)(C). In addition, this Committee may make available "other orders related to the complaint proceedings" by posting them on *www.uscourts.gov*, the website on which we must post our own orders "constituting final action on a complaint proceeding." JCD Rule 24(c).

■ The publication requirement in the Act and in the JCD Rules balances the need to preserve the confidentiality of the identity of a judge who is subject to a complaint of misconduct or disability to which no merit has yet been ascribed, with the need for transparency and public confidence once the Circuit Judicial Council has adjudicated the matter on the merits. The statutory provision requiring public disclosure of orders was one of several that were added to an earlier draft of the Act, to "requir[e] the procedures and institutions involved [in the process] to be more open to public scrutiny" and to serve the "goal of insuring public access to the [complaint] process." 126 Cong. Rec. S. 13854, 3860–13861 (daily ed. Sep. 30, 1980); 126 Cong. Rec. H. 10188, 10190–10191 (daily ed. Oct. 1, 1980).

■ In this matter, the proceedings concluded when the Ninth Circuit Judicial Council issued its March 15 order, which rendered a final decision on the merits. Even though the period for review had not yet elapsed, the order was a final decision because the Council had adjudicated the matter on the merits after having received a report from a special investigating committee. Moreover, the March 15 order was subject to the § 360(b) publication requirement, because it ordered action "to assure the effective and expeditious administration of the business of the courts" within the meaning of 28 U.S.C. § 354(a)(1)(C). Accordingly, and irrespective of the vacatur, the March 15 order must be published, under both the Act and the JCD Rules. 28 U.S.C. § 360(b); JCD Rule 24(a).

### B. The "Intervening Event"

■ The Ninth Circuit Judicial Council in this instance misapplied the Act and the JCD Rules by invoking Judge Cebull's retirement as an "intervening event" warranting vacatur of the March 15 order and

dismissal of the complaints as "moot." Although a Circuit Judicial Council may conclude a proceeding "because . . . intervening events have made the proceeding unnecessary," JCD Rule 20(b)(1)(B), such a disposition "after appointment of a special committee" is available only if "no final decision has been rendered on the merits." JCD Rule 24(a) cmt. In other words, the JCD Rules contemplate that an "intervening event" is one that occurs before the Circuit Judicial Council has rendered factual and legal findings.[6]

The Ninth Circuit Judicial Council adjudicated the complaints on March 15, 2013. For purposes of JCD Rule 20(b)(1)(B), the complaint proceeding concluded when the Council issued its March 15 order, a decision on the merits. At that time, there was no intervening event to moot the Circuit Judicial Council's disposition.[7] Because Judge Cebull's retirement came after the adjudication of the merits, it was not literally "intervening" and thus did not qualify as an intervening event under the Act and the JCD Rules.

Judge Cebull's retirement only affected the prospective sanctions imposed by the March 15 order, rendering them inoperative. This applies to the order's provisions that commanded Judge Cebull to undertake, or cooperate in, specified remedial actions. The Ninth Circuit Judicial Council could have issued a supplemental order, for publication alongside its March 15 order, declaring that the retirement had divested the Council of its jurisdiction to enforce these remedies. But the Circuit Judicial Council's factual findings and legal conclusions on misconduct must be published.

As with the requirement that all orders implementing the Act be published, the preclusion of mootness termination under these circumstances is important to maintain public confidence in judicial conduct and disability complaint proceedings.[8] The imperative of transparency of the complaint process compels publication of orders finding judicial misconduct. Accordingly, even if the corrective action ordered in this matter is no longer applicable, this subject judge's retirement after a finding that he had committed judicial misconduct was not an intervening event under JCD Rule 20(b)(1)(B).

## IV. Conclusion

The Ninth Circuit Judicial Council's March 15 order, attached herewith, is adopted and published as the final order disposing of Judge Cebull's and Judge McKee's complaints on the merits, although its provisions commanding Judge Cebull to take remedial action are declared inoperative. The Council's vacatur order

---

**6.** The structure of Rule 20, captioned "Judicial Council Consideration of Reports and Recommendations of Special Committees," makes clear that the rule's options, including termination of a proceeding based on intervening events, come into play during the pendency of a special committee report before the Judicial Council, not post adjudication. In particular, Rule 20(b) authorizes a complaint proceeding to be concluded because the intervening event has made it unnecessary to adjudicate the complaint.

**7.** Past orders, including those cited by the Ninth Circuit council, *see, e.g., In re Charge of*

*Judicial Misconduct,* 782 F.2d 181 (9th Cir. C.J.1986), are not to the contrary, as they addressed situations in which a subject judge's resignation or retirement occurred either before the complaint was filed or at a point in complaint proceedings when no order on the merits had been issued.

**8.** Sound administration of the act excludes "institutional favoritism," *see* Implementation of the Judicial Conduct and Disability Act of 1980—A Report to the Chief Justice, 239 F.R.D. 116, 119 (2006) ("Breyer Report").

of May 13 and its order of July 2 are also attached and published herewith. The publication requirements of 28 U.S.C. § 360(b) and JCD Rule 24(a) are thereby satisfied. Resolution of the ten remaining complaints in this matter is left to the Ninth Circuit chief judge and Judicial Council.

## ORDER AND MEMORANDUM

March 15, 2013

Before: KOZINSKI, Chief Judge, WALLACE, FISHER and CLIFTON, Circuit Judges, BEISTLINE, KING and WILKEN, Chief District Judges, and ISHII and McNAMEE, District Judges.[1]

On March 1, 2012, Richard Cebull, Chief District Judge for the District of Montana, wrote to Chief Judge Kozinski and asked that an inquiry be conducted as to whether his transmittal of an email about President Obama's mother constituted misconduct under the Judicial Conduct and Disability Act. In the letter, he apologized for his "serious mistake and lack of judgment." He also attached a letter of apology sent to President Obama. This matter was docketed as Complaint of Judicial Misconduct No. 12–90026.

Judge Cebull waived the confidentiality of his request, and his letter to Chief Judge Kozinski and his apology to the President were posted on the Ninth Circuit website. We name Judge Cebull in this order based on his waiver of confidentiality and our finding that the publicity and outcry surrounding this incident constitute extraordinary circumstances requiring public assurance that the federal judiciary is redressing the judicial misconduct. Judicial–Conduct Rule 23(a).

On February 20, 2012, Judge Cebull forwarded the email referenced above from his official court email account to six friends, at least one of whom forwarded it to others. The email reached a reporter for the *Great Falls Tribune,* who published an article quoting the email on February 29, 2012. According to the article, Judge Cebull maintained to the reporter that he sent the email not because it was racist but instead because it was "anti-Obama." Judge Cebull is quoted as saying: "The only reason I can explain it to you is I am not a fan of our president, but this goes beyond not being a fan." The article also states that Judge Cebull agreed the email was racist, but denied any personal racial bias. Judge Cebull made similar comments to the *Billings Gazette,* which were published in a February 29, 2012 article: "There's no doubt it's racist. It wasn't forwarded for that purpose.... If anything, it's political." Judge Cebull added that he intended the email to be private and said that he would "never forward or send another email from his office that isn't business related."

This event generated nationwide media coverage, and a number of groups and individuals called on Judge Cebull to resign. On March 23, 2012, Chief Judge Kozinski referred Complaint No. 12–90026 to a Special Committee for investigation. Members of the Special Committee are Circuit Judge M. Margaret McKeown, presiding officer; Circuit Judge Richard A. Paez; Chief Judge Rosanna Peterson, Eastern District of Washington; District Judge Raner Collins, District of Arizona; and Chief Judge Kozinski, *ex officio.* Douglas R. Young of Farella Braun + Martel LLP, San Francisco, California, was appointed counsel to the Special Com-

---

**1.** Hon. Sidney R. Thomas and Richard C. Tallman did not participate in the consideration of this matter.

mittee pursuant to Judicial–Conduct Rule 13(c).

Chief Judge Theodore A. McKee of the Third Circuit also filed a complaint, docketed at No. 12–90032, arising out of the same events, and requested that his identity as complainant be disclosed. Chief Judge Kozinski referred Chief Judge McKee's complaint to the Special Committee for inclusion in the investigation. Because other filed complaints were based solely on public reports and did not offer any firsthand information, they were held in abeyance pending resolution of Complaint Nos. 12–90026 and 12–90032.

Pursuant to Judicial–Conduct Rule 17, the Special Committee issued a Report ("the Report") to the Judicial Council on December 17, 2012. The Report described the Special Committee's thorough investigation, which focused on 1) retrieval, review and analysis of Judge Cebull's emails; 2) interviews with key witnesses; 3) analysis of Judge Cebull's cases; and 4) the interview with Judge Cebull and materials submitted by his counsel.

*Email Review*

The Special Committee had initially assumed the investigation related to a single inappropriate email. The Special Committee still undertook an extremely detailed and time-consuming review to obtain additional information about the February 2012 email and to determine whether the email was an isolated incident or whether Judge Cebull had a pattern or practice of sending inappropriate emails. The investigation revealed that there were hundreds, and the volume and nature of similar inappropriate emails was unanticipated.

Judge Cebull has only one court email account, from which the February 2012 email was sent. During the period he served as a judicial officer, beginning as a magistrate judge in 1998, and as a district judge since July 2001, he did not possess a personal or any other email account. The Special Committee retrieved Judge Cebull's email archives from the backup tapes maintained by the Administrative Office of the United States Courts, which go back to 2008. Backup tapes were obtained for multiple dates, effectively providing "snapshots" showing all files present in the account at the time of each backup and allowing a more comprehensive review.

The Special Committee's review encompassed approximately four years of Judge Cebull's personal, noncourt related correspondence. The bulk of the noncourt emails included personal correspondence, forwarded cartoons, articles or video links and forwarded jokes. The recipients included Judge Cebull's personal and professional contacts, as well as court staff. Committee staff logged only emails that related to race, politics, religion, gender, sexual orientation, and politically sensitive issues, or that were inappropriate for Judge Cebull to have sent from his federal email account. Hundreds of emails fell within one or more of these categories.

The majority of the emails were political in nature. Whether they were cast as jokes or serious commentary, the emails showed disdain and disrespect for liberal political leaders. A significant number of emails were race related. Whether cast as jokes or serious commentary, the emails showed disdain and disrespect for African Americans, Native Americans and Hispanics, especially those who are not in the United States legally. A similarly significant number of emails related to religion and showed disdain for certain faiths. Approximately the same number of emails concerned women and/or sexual topics and were disparaging of women. A few emails contained inappropriate jokes relating to sexual orientation. Finally, a large number of emails related to pending legislation

or an issue that could come before the court, such as immigration, gun control, civil rights, health care or environmental matters.

*Witness Interviews*

The Special Committee and its staff also traveled to Montana and interviewed over 25 witnesses, including key individuals in Montana's legal community, court staff and Judge Cebull's professional and social contacts. In addition, the Special Committee interviewed a number of individuals who had exchanged inappropriate emails with Judge Cebull, including recipients of the February 2012 email. A few interviews were conducted by video conference and telephone. Judicial–Conduct Rule 23 prevents the identification of specific interviewees, so their comments are generally summarized here.

The interviews focused on Judge Cebull's professional conduct, his reputation, his attitudes towards women and minorities and the witnesses' personal experiences with Judge Cebull. The witnesses' statements were generally consistent and in the aggregate there was praise for Judge Cebull's conduct on the bench. A few witnesses commented that given the small number of judges in the District of Montana and the close-knit legal community, lawyers might be reluctant to make negative comments about Judge Cebull, even anonymously.

Witnesses generally regarded Judge Cebull as a good and honest trial lawyer, and an esteemed trial judge. There were no specific reports of bias or prejudice in Judge Cebull's professional conduct, including from attorneys who had appeared before him on multiple occasions. Those with knowledge of his sentencing practices did not identify any troubling general practices or specific cases where his sentences may have been unfair. A number of witnesses who were friendly with Judge Cebull commented that they thought he made extra efforts to be fair to and accommodate Native Americans, including regularly approving their requests to conduct traditional rituals while incarcerated. The Special Committee did not learn of any concerns with respect to recusal of Judge Cebull.

Although there were some general detractors, the Special Committee uncovered no information that Judge Cebull had made comments or taken other actions in his personal or private life that demonstrated racial or other prejudice. Judge Cebull's friends and acquaintances were adamant that he was not biased in any way, and commented that they often saw him interact with minorities without prejudice. Many witnesses, however, also believed that the single disclosed email and associated publicity undermined not only Judge Cebull's personal reputation, but the reputation of the judiciary and the Montana legal community as a whole.

Many of the witnesses had talked to Judge Cebull about the email. Judge Cebull discussed it not only with his social and professional contacts but traveled to every division of the District of Montana and met with court staff individually to apologize and allow them to raise any concerns. Recipients and nonrecipients alike viewed Judge Cebull's actions in forwarding the email to be "stupid" and in poor judgment. Those witnesses who had spoken to Judge Cebull said that he had also stated that what he did was inexcusable and stupid. In the main, the witnesses, except a few with whom he exchanged multiple emails, did not know about Judge Cebull's extensive email correspondence or his practice of forwarding large numbers of email jokes.

*Review of Cases*

The Special Committee further analyzed Judge Cebull's cases, with particular atten-

tion to sentencing practices, civil rights cases and appeals. The Special Committee did not see evidence of bias in any area. The Special Committee requested data from the U.S. Sentencing Commission ("USSC") on Judge Cebull's sentencing practices from 2005 to the present. The USSC provided the Special Committee with detailed data, broken down by race, showing the number of within-guidelines sentences as well as the number of upward and downward departures. The USSC provided additional detailed data with respect to certain individual departures. The Special Committee thoroughly examined Judge Cebull's sentencing practices with respect to particular crimes and ethnic groups, and found no evidence of bias against nonwhite defendants.

The Special Committee also reviewed appeals of Judge Cebull's cases to the Ninth Circuit that resulted in published opinions or unpublished memorandum dispositions between July 2009 and July 2012. The Special Committee did not identify any specific reversals or vacated cases as troubling, nor did it identify any troubling patterns in the types of cases that were appealed.

The Special Committee also reviewed statistics on the disposition of the labor, civil rights and prisoner civil rights cases Judge Cebull heard over the last five years. The Special Committee did not see any anomalous patterns in the data, including the appeals of those cases. The Special Committee did not hear reports of bias in any such cases.

### Interview of Judge Cebull

The Special Committee conducted an interview with Judge Cebull, who was represented by his counsel. The interview was conducted primarily by the Special Committee's counsel, and Committee members had the opportunity to ask additional questions of Judge Cebull. Judge Cebull ac-

knowledged the seriousness of the issue and did not attempt to minimize or explain away the February 2012 email. Discussing the personal implications, he said that his "public shaming [in reaction to the email] has been a life-altering experience." He said he was "acutely aware that each day in my court is the most important day in someone's life" and said that his behavior had undermined public confidence in the judiciary. Judge Cebull acknowledged that the February 2012 email was inappropriate, but repeatedly emphasized that he was not biased in court or in his personal attitudes or conduct. Judge Cebull acknowledged his history of inappropriate emails and emphasized that all of the messages were intended as private communications. He said that once the story came out, he stopped sending and receiving any personal email.

### Public Response

The Special Committee also obtained the letters, faxes and phone calls received directly by Judge Cebull following the February 2012 news articles. The bulk of these communications were negative with respect to the initial email. The Montana State Bar also forwarded the correspondence it received to the Special Committee. Judge Cebull's counsel provided letters from attorneys and other supporters. The Special Committee reviewed and considered these communications in preparing the Report.

On September 24, 2012, Judge Cebull announced that he would take senior status effective March 18, 2013. As a senior judge, he would remain subject to the Rules for Judicial–Conduct and Judicial-Disability Proceedings. Thus, his decision does not affect the disposition of this matter.

The conduct at the core of these Complaints consists of Judge Cebull's sending,

from his court email address, a racist and politically partisan email to a small group of friends. In response to publicity, he publicly explained the email was not intended as racist, but was instead anti-Obama. Publicity was widespread and there was an overwhelming negative reaction not only to the email but also to Judge Cebull's explanatory and/or exculpatory comments. The expressions of support vis-a-vis the email were in comparison minimal, and generally reflected a mistaken impression that this was an isolated incident. However, Judge Cebull sent hundreds of other inappropriate emails to court staff and individuals outside the court. The quantity and nature of these emails underscores the magnitude of Judge Cebull's breach of judicial ethics and the public trust.

Although the allegations in Complaint No. 12–90032 relate to Judge Cebull's performance of his official duties and the administration of justice, the Special Committee did not uncover misconduct in that area. Cognizable misconduct nevertheless can include conduct occurring outside the performance of official duties that is "prejudicial to the effective and expeditious administration of the business of the courts" under 28 U.S.C. § 351, which can include "a substantial and widespread lowering of public confidence in the courts among reasonable people." Judicial–Conduct Rule 3(h)(2).

Under 28 U.S.C. §§ 351–364, the Judicial Council has the power to decide whether Judge Cebull has "engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts." Remedial actions that may be taken by the Judicial Council are prescribed under 28 U.S.C. § 354(a), and include the following:

(a) censuring or reprimanding the subject judge, either by private communication or by public announcement;

(b) ordering that no new cases be assigned to the subject judge for a limited, fixed period;

(c) requesting the judge to retire voluntarily with the provision (if necessary) that ordinary length-of-service requirements will be waived.

If a judge engaged in conduct that might constitute grounds for impeachment, the Judicial Council would refer that complaint to the Judicial Conference. Judicial–Conduct Rule 20(b)(2).

*Disposition*

After due consideration of the record, the Judicial Council adopts the Special Committee's Findings of Fact. *See* Judicial–Conduct Rule 20(d). Based thereon, the Judicial Council takes the following actions:

 1. The Judicial Council hereby publicly reprimands Judge Cebull for conduct prejudicial to the effective administration of the business of the courts. 28 U.S.C. § 351. The racist and political February 2012 email, particularly when coupled with the hundreds of other emails regularly sent from Judge Cebull's court email account, reflects negatively on Judge Cebull and on the judiciary and undermines the public trust and confidence in the judiciary.

This conduct is contrary to the Code of Conduct for United States Judges which "may provide standards of conduct for application" in judicial conduct proceedings under 28 U.S.C. § 351. Commentary to Canon 1. In sending these emails, Judge Cebull violated his pledge "to uphold the integrity and independence of the judiciary" in Canon 1. As the Commentary to Canon 1 notes, "violation of this Code diminishes public confidence in the judiciary

and injures our system of government under law." The strength and breadth of the public reaction to the publication of the February 2012 email illustrates the severity of the violation. We conclude that these acts constitute "conduct prejudicial to the effective administration of the business of the courts" under 28 U.S.C. § 351.

Judge Cebull's conduct also runs afoul of Canon 2 which provides that a "judge should avoid impropriety and the appearance of impropriety in all activities." Canon 2(A). More specifically, the commentary counsels that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges" and that the prohibition to "avoid all impropriety and appearance of impropriety ... applies to both professional and personal conduct." Even if Judge Cebull intended his emails to remain private, he was indifferent to their potential negative impact. *See* Commentary to Canon 2(A) (a "judge must expect to be the subject of constant public scrutiny"). In this case, we conclude that his conduct was "prejudicial to the effective administration of the business of the courts." 28 U.S.C. § 351.

Canon 5 provides that "a judge should refrain from political activity." This restriction includes making public speeches, commenting on a candidate for public office and "any other political activity." Canon 5(A)(2). This Canon does not preclude a judge from having political opinions or even sharing those opinions in private among friends. However, disseminating political opinions via a court email account to court staff and to individuals outside the judiciary contravenes this Canon. Judge Cebull compounded his mistake in forwarding political emails by making anti-Obama statements to reporters who called for comment on the February 2012 email. Judge Cebull repeatedly violated his duties under Canon 5. This conduct too, we conclude, was "prejudicial to the effective administration of the business of the courts" under 28 U.S.C. § 351.

2. We have concluded that Judge Cebull took no action in this matter that violated federal or Montana state law and thus impeachment is not warranted. Nonetheless, in recognition of the severity of his violation and the breadth of the public reaction, the Judicial Council orders that no new cases be assigned to Judge Cebull for a period of 180 days, such period to begin at the direction of the Judicial Council. *See* 28 U.S.C. § 354(a) and Rule 20. During this period, Judge Cebull should undertake the training and other requirements set out in paragraphs 3 and 4 below.

3. Although we conclude based on our review of Judge Cebull's cases that he has not demonstrated bias in his professional behavior, his email practices create a substantial possibility that his neutrality could be questioned. To restore the public's confidence that any possible conscious or unconscious prejudice will not affect future decisions, Judge Cebull shall complete training on judicial ethics, racial awareness and elimination of bias, including unconscious or latent bias, before his suspension is terminated. Any training must be of sufficient breadth and depth to raise Judge Cebull's awareness of how and why his emails were interpreted as political, racist, sexist or otherwise biased. Following the completion of such training, Judge Cebull shall engage in public outreach to help sensitize the legal community and the community at large in order to avoid repetition of such misconduct in the future. The Judicial Council appoints District Judge Raner Collins from the District of Arizona, who served as a member of the Special Committee, to monitor and advise Judge Cebull on appropriate activities to fulfill

the requirements of this Order, and to keep the Judicial Council apprised accordingly.

4. The Judicial Council strongly condemns Judge Cebull's past email practices, and Judge Cebull's initial apology, which was insufficient to acknowledge fully or redress his past actions and the totality of his discriminatory emails. Further measures are therefore appropriate to instill public confidence in the judiciary. Judge Cebull must issue a second public apology, approved by the Judicial Council, that acknowledges the breadth of his behavior and his inattention to ethical and practical concerns surrounding personal email.

5. All parties and attorneys involved in cases assigned to Judge Cebull may move to recuse him based on conduct or concerns arising out of this Order or claims related to any of the categories of individuals or groups referenced in the Order. Any motions to recuse based on this Order will be referred to an out-of-district judge for resolution.

*Separate Statement by Chief District Judge Wilken and District Judge Ishii*

We concur with the Judicial Council's order and agree that the discipline set out therein should be imposed. We would go further. In our view, the Judicial Council should request that Judge Cebull retire voluntarily from the judiciary under 28 U.S.C. § 371(a) in recognition of the severity of his violation and the breadth of the public reaction. *See* 28 U.S.C. § 354(a)(2)(B)(ii) and Judicial–Conduct Rule 20.

1. Hon. Sidney R. Thomas and Richard C. Tallman did not participate in the consideration of this matter.

1. Circuit Judges Sidney R. Thomas and Richard C. Tallman did not participate in the consideration of this matter.

ATTACHMENT

## ORDER

May 13, 2013

Before: KOZINSKI, Chief Judge, WALLACE, FISHER and CLIFTON, Circuit Judges, BEISTLINE, KING and WILKEN, Chief District Judges, and ISHII and McNAMEE, District Judges.[1]

The Judicial Council's March 15, 2013 Order and Memorandum is vacated as moot pending further Order of the Council. In light of Judge Cebull's May 3, 2013 retirement, pursuant to 28 U.S.C. § 371(a), and the resulting change of circumstances, the Council will consider appropriate revisions to the Order and Memorandum at its next meeting, scheduled for June 28, 2013.

## ORDER

July 2, 2013

Before: KOZINSKI, Chief Judge, WALLACE, FISHER and CLIFTON, Circuit Judges, BEISTLINE, KING and WILKEN, Chief District Judges, and ISHII and McNAMEE, District Judges.[1]

On March 1, 2012, Richard Cebull[2], who was at that time the Chief District Judge for the District of Montana, wrote to Chief Judge Kozinski and asked that an inquiry be conducted as to whether his transmittal of an email about President Obama's mother constituted misconduct under the Judicial Conduct and Disability Act. In the letter, he apologized for his "serious mistake and lack of judgment," and attached a letter of apology sent to President Obama.

2. The Judicial Council has determined that Judge Cebull's name should be disclosed in this order. *See* Judicial–Conduct Rules 23(a) and 24(a)(2).

This matter was docketed as Complaint of Judicial Misconduct No. 12–90026.

On February 20, 2012, Judge Cebull forwarded the email referenced above from his official court email account to six friends, at least one of whom forwarded it. The email reached a reporter for the *Great Falls Tribune,* who published an article quoting the email on February 29, 2012. According to the article, Judge Cebull maintained to the reporter that he sent the email not because it was racist but instead because it was "anti-Obama." Judge Cebull is quoted as saying: "The only reason I can explain it to you is I am not a fan of our president, but this goes beyond not being a fan." The article also states that Judge Cebull agreed the email was racist, but denied any personal racial bias. Judge Cebull made similar comments to the *Billings Gazette,* which were published in a February 29, 2012 article: "There's no doubt it's racist. It wasn't forwarded for that purpose.... If anything, it's political." Judge Cebull added that he intended the email to be private and said that he would "never forward or send another email from his office that isn't business related." This event generated nationwide media coverage, and a number of groups and individuals called on Judge Cebull to resign.

On March 23, 2012, Chief Judge Kozinski referred Complaint No. 12–90026 to a Special Committee for investigation. Members of the Special Committee are Circuit Judge M. Margaret McKeown, presiding officer; Circuit Judge Richard A. Paez; Chief Judge Rosanna Peterson, Eastern District of Washington; District Judge Raner Collins, District of Arizona; and Chief Judge Kozinski, *ex officio.* Douglas R. Young of Farella Braun + Martel LLP, San Francisco, California, was appointed counsel to the Special Committee pursuant to Judicial–Conduct Rule 13(c).

Chief Judge Theodore A. McKee of the Third Circuit also filed a complaint, docketed at No. 12–90032, arising out of the same events, and requested that his identity as complainant be disclosed. Chief Judge Kozinski referred Chief Judge McKee's complaint to the Special Committee for inclusion in the investigation. Because other filed complaints were based solely on public reports and did not offer any firsthand information, they were held in abeyance pending resolution of Complaint Nos. 12–90026 and 12–90032.

Pursuant to Judicial–Conduct Rule 17, the Special Committee issued a Report ("the Report") to the Judicial Council on December 17, 2012. The Report described the Special Committee's thorough investigation, which focused on 1) retrieval, review and analysis of Judge Cebull's emails from 2008–2012; 2) interviews with over 25 key witnesses in Montana; 3) analysis of Judge Cebull's cases; and 4) an interview with Judge Cebull and materials submitted by his counsel.

The Special Committee's extensive and thorough investigation found no evidence of misconduct as to Judge Cebull's performance of his official duties. The Special Committee analyzed Judge Cebull's cases, with particular attention to sentencing practices, civil rights cases and appeals. The Special Committee requested data from the U.S. Sentencing Commission ("USSC") on Judge Cebull's sentencing practices from 2005 to the present. The USSC provided the Special Committee with detailed data, broken down by race, showing the number of within-guidelines sentences as well as the number of upward and downward departures. The USSC provided additional detailed data with respect to certain individual departures. The Special Committee thoroughly exam-

ined Judge Cebull's sentencing practices with respect to particular crimes and ethnic groups, and found no evidence of bias against nonwhite defendants.

The Special Committee also reviewed appeals of Judge Cebull's cases to the Ninth Circuit that resulted in published opinions or unpublished memorandum dispositions between July 2009 and July 2012. The Special Committee did not identify any specific reversals or vacated cases as troubling, nor did it identify any troubling patterns in the types of cases that were appealed.

The Special Committee also reviewed statistics on the disposition of the labor, civil rights and prisoner civil rights cases Judge Cebull heard over the last five years. The Special Committee did not see any anomalous patterns in the data, including the appeals of those cases. The Special Committee did not hear reports of bias in any such cases.

The Special Committee undertook an extremely detailed and time-consuming review to obtain additional information about the February 2012 email, and to determine whether the email was an isolated incident or whether Judge Cebull had a pattern or practice of sending inappropriate emails. The investigation revealed that Judge Cebull sent a substantial number of similarly inappropriate emails from his court email account.

The Special Committee and its staff also traveled to Montana and interviewed over 25 witnesses, including key individuals in Montana's legal community, court staff and Judge Cebull's professional and social contacts. The witnesses generally regarded Judge Cebull as a good and honest trial lawyer, and an esteemed trial judge. There were no specific reports of bias or prejudice in Judge Cebull's professional conduct, including from attorneys who had appeared before him on multiple occasions. Those with knowledge of his sentencing practices did not identify any troubling general practices or specific cases where his sentences may have been unfair.

The Special Committee conducted an interview with Judge Cebull, who was represented by his counsel. Judge Cebull acknowledged the seriousness of the issue and expressed remorse for his conduct. Discussing the personal implications, he said that his "public shaming [in reaction to the email] has been a life-altering experience." He said he was "acutely aware that each day in my court is the most important day in someone's life" and that his behavior had undermined public confidence in the judiciary. He said that once the story came out, he stopped sending and receiving any personal email.

The Judicial Council found misconduct with regard to the emails Judge Cebull sent from his court account, and issued an Order and Memorandum on March 15, 2013, imposing a number of remedial and disciplinary measures. 28 U.S.C. § 354. The Order was kept confidential during the appeal period pursuant to Judicial-Conduct Rules 22 and 24(a). On March 29, 2013, Judge Cebull submitted his retirement letter, pursuant to 28 U.S.C. § 371(a), effective May 3, 2013. Due to the resulting changed circumstances, the Judicial Council vacated its March 15, 2013 Order on May 13, 2013.

Because Judge Cebull has resigned and is no longer a federal judge, the misconduct procedures and remedies no longer apply to him. 28 U.S.C. § 351(d); Judicial-Conduct Rule 4; *In re Charge of Judicial Misconduct*, 782 F.2d 181 (9th Cir.Jud.Council 1986) (holding that when the subject of a complaint is no longer a judicial officer, he is beyond the reach of the misconduct procedures and the reme-

dies that they prescribe). The Judicial Council holds that this intervening event concludes these proceedings, and dismisses the complaints as moot. 28 U.S.C. § 354(a)(1)(B); *see also* Judicial–Conduct Rule 20(b)(1)(B).

This is the final Order of the Judicial Council, and shall be made public 63 days after its filing if no petition for review is filed before that date. *See* Judicial–Conduct Rules 22(c) and 24(a).